## Cox v. Burns & Rentgen.

The right of an unpaid vendor to reclaim goods while still *in transitu*, is paramount to the lien of an attaching creditor of the vendee.

An anxiety manifested by the vendee that the goods should be reclaimed, does not defeat the right of the vendor.

The right continues until the goods have come to the actual or constructive possession of the vendee, notwithstanding the vendee refuse to receive them, if reclaimed within a reasonable time.

What is meant by the books when they assert that stoppage *in transitu* is an *adverse* proceeding, and must be exercised adversely to the vendee, is, that it must not be asserted under a *title* derived from the vendee, and not that it must be asserted in *hostility* to him.

If the vendor repossesses himself of the goods at the instance of the vendee, before the termination of the transit, this is not a stoppage of the goods *in transitu* in a technical sense, but a recision of the contract of consignment, yet the vendor's lien remains, until so repossessed, unimpaired.

### *Appeal from the Lee District Court.*

Cox sued W. H. Farner & Co. in the District Court of Lee county, by attachment, on which Burns & Rentgen were garnished, and who answered, denying the possession or control of property of Farner & Co. Issue was taken on this answer. The trial was had by the court, without a jury, the court being requested to give its decision in writing, stating the facts found, in pursuance of section 1793 of the Code.(1) On the trial, two bills of exception were

---

(1) *Sec.* 1793.—Upon a trial of a question of fact by the court, its decision, if requested by either party, shall be given in writing, stating the facts found and the 'conclusion founded thereon, separately, all which shall be entered upon the record. Code, 259.

Cox v. Burns & Rentgen.

signed, but by an order of this court, made by the late bench, at the December term, 1854, so much of the evidence contained in the said bills of exception as involved the adjudication of the facts of the case, was stricken from the transcript. It is, therefore, on the facts found by the court below, as set out in the statement of the judge, that the decision of this court is based.

The court below found the following state of facts to exist: W. H. Farner & Co. purchased the goods in controversy, on a credit, of O. Ihmson, of Pittsburg, prior to the 14th day of November, 1853, which were regularly consigned by said Ihmson to Farner & Co., at Keokuk, Iowa. A few days before the arrival of said goods in part, the house of W. H. Farner & Co. failed—became insolvent—and was closed up by the sheriff—at which time Major Warren (since deceased), of the firm of Francis Walton & Warren, of St. Louis, was at Keokuk, claiming to be the friend and agent of Ihmson. A few days prior to the arrival of the goods in question, Taunton, of the firm of W. H. Farner & Co., requested Major Warren to take possession of the goods or glass, if it came, for the benefit of Ihmson, and also instructed him to write Ihmson, and have the glass stopped. On the 14th of November, 1853, the goods arrived at Keokuk, on the steamer Cuba, for which Burns & Rentgen were the agents, who immediately informed the captain of said boat that the consignees of the goods, W. H. Farner & Co., had failed, and that he must not deliver the goods till the freight was paid. A bill of freight was immediately taken, by the clerk of Burns & Rentgen, to Farner & Co. for payment. Their house was found closed, and payment was not made. About this time, and while the goods were still on board of the boat, Major Warren appeared upon the boat, and claimed to take and control the goods for the benefit of Ihmson. His authority being questioned, he said he was the agent of Ihmson, and as such claimed possession of the goods. Under his directions, they were taken from the boat, and stored with Burns & Rentgen, who paid the captain of the boat the charges on the

same. The firm of Farner & Co. did not receive the goods, or get possession of them, [although Taunton testifies that he had control of the goods at the time.] While this was transpiring, the sheriff made his appearance, with a writ of attachment in favor of plaintiff against Farner & Co., but finding difficulty in relation to the goods, did not then levy or attach. On the next day, the 15th, he did attach the goods, in possession of Burns & Rentgen, by garnishment. [In relation to this transaction, Taunton testifies that on the levee, without receiving the goods, being unable to pay the freight, they made over, or turned over (using both expressions), the goods to Major Warren, the professed agent of Ihmson, and for the use and benefit of said Ihmson; and gave, as a reason for doing so, that they had bought the goods of him on a credit, and were anxious to have them go to pay him their account for the same.] The bill of lading was delivered over to Major Warren, at the time he took possession of the glass. About the 1st of December, 1853, Mr. McGowen, who was the confidential clerk and collecting agent of O. Ihmson in the west, arrived in Keokuk, from Pittsburg. He came immediately, upon receiving notice from the house of Francis Walton & Warren, of St. Louis, of what had been done by Warren in relation to the goods. He fully ratified and sanctioned what Warren had done in the premises, [and represented the major as being the agent of O. Ihmson.] McGowen sold the glass in question to H. H. Ayres, who received the goods from Burns & Rentgen, and paid the charges by them; and Farner & Co. gave their note to Ihmson, to cover charges in coming west to carry out the object of turning over the goods in controversy.

On this finding of facts, the court below concluded that the right of the attaching creditor, Cox, was paramount to that of Ihmson, and rendered judgment against Burns & Rentgen, as garnishees of W. H. Farner & Co. From this judgment, the garnishees appeal to this court, alleging that the conclusion of the court on the facts found, and the judgment rendered thereon, are erroneous.

*Edwards & Turner*, for the appellants, made and argued fully the following points:

1. An insolvent vendee may rescind the contract of sale, with the assent of the vendor, which will be presumed. 1 Strange, 165; Long on Sales, 247, 256; 5 Durnf. & East, 111; 15 Eng. Com. Law, 79; Flanders on Shipping, 523; 5 Mass. 156; 1 Hill, 303.

2. As to the vendor's right of stoppage *in transitu.* Long on Sales, 308, 294, 295; 2 Mees. & Wels. 375 and 623; 9 Ib. 517; Flanders on Shipping, 519; 14 Mass. 40; *Buckley* v. *Furniss*, 15 Wend. 137; *Covell* v. *Hitchcock*, 23 Ib. 610; 8 Pick. 198; 4 Dana, 8; 10 Texas, 2; 14 B. Monr. 324; *Aguine* v. *Parmelee*, 22 Conn. 473; *Lickbarrow* v. *Mason*, 1 Smith's Lead. Cas. 765.

3. As to the ratification of the unauthorized acts of agents. Story on Agency, §§ 45, 46, 47, 244; Story on Cont. §§ 162, 163; *Lickbarrow* v. *Mason*, 1 Smith's Lead. Cas. 765.

*Samuel F. Miller*, for the appellee, contended:

1. Warren was not the agent of Ihmson, when he placed the goods under the control of Burns & Rentgen. The only testimony offered of his agency, was his own declarations, and they are not competent to prove his agency. His agency must be proved, before his declarations could be received. 1 Greenl. Ev. § 154; 3 Blackf. 436.

2. That the subsequent ratification of the acts of an unauthorized agent, depending wholly on such ratification, could not divest the rights of third parties acquired in good faith, before the ratification. Story on Agency, §§ 246, 247, 440; Story on Cont. § 163; 7 Cowen, 746; 7 Alabama, 800.

3. That the stoppage *in transitu* must be exercised adversely to the vendee, and not under him. 2 Kent Com. 714.; Abbott on Ship. 621; Flanders on Ship. 522.; 6 East, 371.; 5 Mass. 156.

[The clauses embraced in brackets in the foregoing statement, this court treated as recitals of evidence, rather than facts found by the court below.]

Isbell, J.—We have examined with much care, most, if not all, the authorities cited by the court below, in support of its position, as well as the numerous authorities cited by the respective counsel, in the able arguments made in this case, have attentively considered the above statement of facts, and arrive at a conclusion different from that of the court below.

That the lien of a vendor of goods sold on credit, during the time that the goods are *in transitu*, is paramount to that of an attaching creditor, whether the attachment is levied before or after the vendors' right to reclaim the goods is asserted, is a point that does not appear to be here questioned. This right is founded upon the implied condition in the sale, that if the vendee should become actually insolvent between the shipment of the goods, and the reception of them by the vendee, the vendor shall have a right to reclaim the goods. To allow an attachment to have effect before the transit is at an end, would be to defeat a useful and necessary provision of the law merchant. *Naylor et al.* v. *Dennie*, 8 Pick. 204. Much has been said in argument upon the question, whether there was any stoppage of these goods *in transitu*. If it were material to determine whether there was any such stoppage, in a strict technical sense, we would say, probably, that there was not, but that the facts found, show a recision of the contract, instead of a stoppage *in transitu*. A stoppage *in transitu*, in a strict sense, being in the language of the books, an *adverse* proceeding, must be exercised adversely to the vendee, which means simply, as we apprehend, as stated by the learned judge, in the case above cited, "no more than that the right of stopping *in transitu*, cannot be exercised under a title derived from the consignee—not that it should be exercised in *hostility* to him"—the force and true meaning of which will be clearly understood by a moment's reflection on the rights of the consignor and consignee in the two cases.

In a strict stoppage, the consignor does not generally become at once restored to all the rights in relation to the goods he had before *sale*, but only to those he would have

after a sale, and before delivery, in case no credit had been given; namely, to hold on to the goods until the price is paid. On the other hand, the *consignee*, in a strict stoppage, generally retains the right to reclaim the goods by paying or tendering the price within a reasonable time, and on so doing has his right of action for the goods. Not so in a case of a *recision*, which contemplates no *adverse* rights; for here the consignor is restored to all the rights he had in the goods before sale. See Story on Sales, chapter 2.

But whether this was a stoppage *in transitu*, in a strict sense, or a recision, is not the question. Whether the assent of Farner & Co. that Ihmson should have back the goods, existed or not, we regard as entirely immaterial. The main, and, perhaps, we may say, the sole question, that arises in this case, is, did Ihmson reclaim the goods before they came into the actual or constructive possession of Farner & Co.? And this is so clear in point of *fact*, that it scarcely can be called a question. The court finds, "that Farner & Co. did not receive or get possession of them" (the goods), and nothing appears showing that any other person got any possession that might be constructively regarded as Farner & Co.'s possession, in case this finding should be construed to mean *actual* possession only. Certainly, Warren did not; he claimed the goods as Ihmson's. When he claimed to be Ihmson's agent, Taunton, of the firm of Farner & Co., requested that he should take possession of the goods, if they came, for the benefit of Ihmson, and to write to Ihmson and have the goods stopped. And here, so far as Farner & Co.'s *intention* to disagree to the consignment was concerned, this intention not to receive the goods, whether Warren was, or was not, the agent of Ihmson, in *fact*, is equally clear, unless something appears that should have led Farner & Co. to suspect that he was not such agent. And nothing is apparent inconsistent with his agency, though not proved by legitimate testimony to be Ihmson's agent. Warren nowhere claimed the goods by any title derived from Farner & Co., nor did he claim any title in himself in any way whatever. Without recounting the facts, we say,

that the whole tenor of the testimony goes to show, that so far from Farner & Co. getting any possession of the goods, they repelled any such possession; and we do not discover anything in the facts found inconsistent with the idea, that the goods were still *in transitu* up to the time McGowen took possession (which is admitted, as well as found, to be Ihmson's possession), unless Warren was, in fact, the agent of Ihmson; and if so, Ihmson reclaimed the goods before the levy of the attachment.

We see nothing in the facts found that could have so impaired Ihmson's lien as an unpaid vendor, as to give the attachment precedence over it. The authorities above cited, and those referred to in them, amply justify the several legal positions herein assumed, and are fully sustained by many others, cited by appellee.

We may add, that there is nothing in the recitals of testimony in brackets, that would materially alter the conclusion at which we have arrived.

Inasmuch as the costs of the court are not here apparent, it is ordered that a procedendo issue to the District Court, requiring it to proceed to enter judgment against the plaintiff, James F. Cox, for costs of suit incurred in that court.

Judgment reversed.